IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Louis Clay Tharp, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 4:11-cv-01819-TLW |
| | ) | |
| Media General, Inc.; Media General | ) | |
| Operations, Inc. d/b/a WBTW CBS News | ) | |
| 13 and the Morning News; Media General | ) | |
| Communications Holdings, LLC d/b/a/ | ) | |
| SCNOW.com; Mason Snyder; and Nicole | ) | |
| Boone, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION AND ORDER

This matter is now before the Court on Motion for Summary Judgment filed by the Defendants, Media General, Inc.; Media General Operations, Inc. d/b/a WBTW CBS News 13 and the Morning News; Media General Communications Holdings, LLC d/b/a SCNOW.com; Mason Snyder, and Nicole Boone (collectively "Defendants"), on May 31, 2013. (Doc. #71). The Plaintiff, Louis Clay Tharp ("Plaintiff"), filed a Response in Opposition to Defendants' motion on July 8, 2013 (Doc. #80), to which Defendants replied on August 5, 2013 (Doc. #88).

On October 17, 2013, this Court held a hearing on Defendants' Motion for Summary Judgment, wherein counsel for both parties presented arguments. (Doc. #99). The Court has carefully considered the pleadings, motions, memoranda and exhibits of the parties. The Court has determined the relevant facts from the record before it and drawn all reasonable factual inferences in favor of the Plaintiff as the nonmoving party. The Defendants' Motion is now ripe for disposition.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff brought this defamation action on July 27, 2011 against the Defendants concerning certain news broadcasts and publications dated August 6, 2010 and January 12, 2012, as well as a posting on the Defendant television station's website and in Defendants' daily newspaper (hereinafter collectively referred to as the "August 6, 2010 disputed publications" or the "August 6, 2010 disputed broadcasts").  (Docs. #1; 44).

On June 18, 2010, Plaintiff was arrested and charged with first-degree sexual abuse and first-degree kidnapping after a minor identified him.  (Doc. #44).  All charges against Plaintiff in connection with the June 18, 2010 alleged incident have since been dismissed and all records of such charges expunged from Plaintiff's record.  (Doc. #44 at 9).  On June 19, 2010, Plaintiff was released on bail and returned to his home in New York.  (Doc. #44).  On June 20, 2010, the Conway Police Department issued a Press Release regarding Plaintiff's arrest.  (Doc. #80-3; see also Doc. #44 ¶ 41).  Plaintiff was originally scheduled to appear in court in Conway on August 6, 2010; however, he was excused from having to appear on that day.  (Doc. #44 ¶ 29).  On that same day, Defendants broadcast and published on their television station, website, and in their daily newspaper an interview taken by Defendant Mason Snyder of the minor and of the minor's mother, conducted in their home, accompanied by a mugshot of the Plaintiff.  (Doc. #44 ¶ 30).

As noted, the Horry County Solicitor's Office dismissed all of the criminal charges brought against Plaintiff on May 19, 2011.  (Doc. #44 at 9).  All records of the criminal charges brought against Plaintiff were ordered to be expunged by Order dated July 13, 2011.  (Doc. #44 at 9 ¶ 46–47).

Plaintiff filed the above-captioned defamation case against Defendants on July 27, 2011, seeking actual, compensatory, and special damages in excess of fifteen million dollars ($15,000,000.00), as well as punitive damages, attorneys' fees and costs, and such other relief as

this Court deems proper.   (Docs. #1; #44).    Plaintiff asserts defamation claims against Defendants and alleges that "the Defendants, without question or verification, broadcast and published the [minor's] false, and at the very least questionable, charges in a biased and one-sided manner that presumed Plaintiff was guilty.  The possibility of Plaintiff being innocent and wrongly accused was not even presented by the Defendants as a possibility since the Defendants stated at the end of the August 6, 2010 broadcast and publication that Plaintiff's options were 'to plead guilty or request a trial.'"  (Doc. #44 at 9 ¶ 44, 45).

Moreover, the Plaintiff alleges that the "Defendants did not interview or seek to interview Plaintiff or his attorney for the August 6, 2010 broadcast and publication, nor did Defendants even contact Plaintiff or his attorney prior to the August 6, 2010 broadcast and publication." (Doc. #44 at 8 ¶ 42; see also Doc. #80-5 at 6–7 (Snyder Depo.)).  Plaintiff alleges that "[i]n the August 6, 2010 broadcasts and publications, Defendants never questioned the veracity or credibility of the charges made by the [minor] against Plaintiff," despite, Plaintiff argues, having information that may lead a reasonable person to conclude that there was a reason to question the veracity of the minor's statements.  (Doc. #44 at 9–10 ¶ 43).

## II.     LEGAL STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment if the pleadings, responses to discovery, and the record reveal "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   The party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).   This burden requires the movant to identify those portions of the "pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of any genuine issues of fact.  Celotex, 477 U.S. at 323; see also Anderson, 477 U.S. at 249.

Though the moving party bears the initial burden, the nonmoving party must then produce specific facts showing that there is a genuine issue for trial.  See Celotex, 477 U.S. at 334.  In satisfying this responsibility, the nonmoving party must offer more than a mere "scintilla of evidence" that a genuine issue of material fact exists, Anderson, 477 U.S. at 252, or that there is "some metaphysical doubt" as to material facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rather, the nonmoving party must produce evidence on which a jury could reasonably find in its favor.  See Anderson, 477 U.S. at 252.

In considering the motion for summary judgment, this Court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party.  See Miltier v. Beorn, 896 F.2d 848 (4th Cir. 1990).  Summary judgment is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there [being] no genuine issue for trial."  Matsushita, 475 U.S. at 587 (1986) (internal quotations omitted).

Summary judgment should only be granted in those cases in which there is no issue of fact involved and inquiry into the facts is not necessary to clarify application of the law.  McKinney v. Bd. of Trustees Mayland Cmty. Coll., 955 F.2d 924 (4th Cir. 1992).  A district court should not grant summary judgment "unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under the circumstances."  Campbell v. Hewitt, Coleman & Assocs., 21 F.3d 52, 55 (4th Cir. 1994).

### III.     DISCUSSION

South Carolina substantive law is applicable to the claims in this case as federal subject matter jurisdiction is grounded on diversity pursuant to § 1332.  The essential elements of a claim for defamation under South Carolina law are: 1) a false and defamatory statement; 2) unprivileged publication to a third party by defendant; 3) fault on the part of the defendant publisher; and 4) actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.  See Floyd v. WBTW, No. 4:06-cv-3120-RBH, 2007 WL 4458924 (D.S.C. Dec. 17, 2007) (citing Erickson v. Jones Street Publishers, LLC, 368 S.C. 444, 455, 629 S.E.2d 653, 664 (2006)).

### A.     "Public Figure", "Private Figure," or "Limited-Purpose Public Figure"

The legal standard applicable in this matter is dependent upon whether the particular Plaintiff in this case is a "public figure," a "private figure," or a "limited-purpose public figure" for purposes of defamation law.  Whether the Plaintiff is a public figure, limited-purpose public figure, or a private figure plaintiff is a question of law for the Court to decide.  Rosenblatt v. Baer, 383 U.S. 75, 87 (1966); Erickson v. Jones Street Publishers, 368 S.C. 444, 474, 629 S.E.2d 653, 669 (2006); see also Foretich v. Capital Cities/ABC, Inc., 37 F.3d 1541, 1551 (4th Cir. 1994).  "The determination [of the plaintiff's status] is a matter of law which must be decided by the court, on a case by case basis after careful examination of the facts and circumstances, before the jury is charged on the law or asked to resolve a case."  Erickson, 368 S.C. at 468–69, 629 S.E.2d at 665–66.

The United States Supreme Court has held that the First Amendment places limitations on tort liability for defamation in certain circumstances. See, e.g., Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 776–77 (1986) (holding that when a plaintiff is a private figure and the speech is a matter of public concern, the First Amendment requires the plaintiff to prove falsity

of the statement); <u>Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.</u>, 472 U.S. 749, 761 (1985) (holding that where speech involves no matters of public concern, "the state interest adequately supports awards of presumed and punitive damages—even absent a showing of 'actual malice'"); <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323, 345–47 (1974) (noting the distinction between public officials, public figures, and private figures with regard to the degree of constitutional privilege a media defendant may claim when publishing matters of public concern and holding that the States were free to "define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehoods injurious to a private individual" as long as they did not impose liability without some degree fault); <u>New York Times Co. v. Sullivan</u>, 376 U.S. 254, 279–80 (1964) (concluding that the First Amendment prevents a "public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not").  The First Amendment limitations on the legal standard applicable to a civil claim for defamation differ based upon: 1) whether the defamed individual is a public figure, public official, limited-purpose public figure, or private figure; and 2) whether the subject matter of the alleged defamatory statement is a matter of public or private concern.

Public figures, public officials, and limited-purpose public figures may only recover for defamation upon a showing of actual malice by clear and convincing evidence.  <u>Erickson</u>, 368 S.C. 444, 467–77, 629 S.E.2d 653, 666–70 (2006).  Actual malice is demonstrated upon showing that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth.  <u>Id.</u>  On the other hand, private figure plaintiffs do not have to show actual malice when seeking to recover compensatory damages in a defamation case.  Rather, under South Carolina defamation law, a private figure defamation plaintiff must show "common law malice."

See id.; see also Floyd, No. 4:06-cv-3120-RBH, 2007 WL 4458924, *3 (D.S.C. Dec. 17, 2007). As later discussed, common law malice under South Carolina defamation law generally "means that the defendant was actuated by ill will in what he did, with the design to causelessly and wantonly injure the plaintiff, or that the statements were published with such recklessness as to show a conscious indifference toward plaintiff's rights." Jones v. Garner, 250 S.C. 479, 488, 158 S.E. 2d 909, 914 (1968).

In this case, the Defendants contend that Plaintiff is a general purpose "public figure" for purposes of defamation law. As such, Defendants argue, Plaintiff is required to demonstrate "actual malice" in order to prevail on his claims. Defendants assert they are entitled to summary judgment because Plaintiff has demonstrated no evidence of actual malice in this matter. (Doc. #71-1 at 25, 34–36).

In response, Plaintiff argues that he is not a general purpose public figure for purposes of the defamation claims asserted in the instant case, nor is he a limited-purpose public figure. Instead, Plaintiff alleges that he is a private figure defamation plaintiff and is therefore not required to demonstrate constitutional actual malice. Plaintiff further argues that, even if this Court were to conclude that Plaintiff is a public figure plaintiff or a limited-purpose public figure plaintiff thereby requiring him to show actual malice, he has presented sufficient evidence to meet the actual malice standard. (Doc. #80).

After careful consideration, this Court concludes that the Plaintiff is not a general purpose public figure for purposes of defamation law. A general purpose public figure is an individual who has achieved "such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." Gertz, 418 U.S. at 351. The Plaintiff in the instant matter is not such an individual. The Supreme Court has held that "only a small group of individuals . . . are public figures for all purposes," Wolston v. Reader's Digest Ass'n, Inc., 443 U.S. 157, 164

(1979), and that "[a]bsent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life." <u>Gertz</u>, 418 U.S. at 351–52.  The Defendants attempt to characterize Plaintiff's professional activities and involvement in his local community in New York as rising to the level of "pervasive fame or notoriety."  Plaintiff has never run for public office.  While Plaintiff did write two books and does run a blog, the Court finds these activities are insufficient to render the Plaintiff a general purpose public figure for all purposes and in all contexts.  In sum, the Defendants have not shown clear and convincing evidence that Plaintiff has achieved such pervasive fame or notoriety that is required for general purpose public figure status.  Accordingly, this Court concludes Plaintiff is not a general purpose public figure.

Next, this Court must examine whether Plaintiff is a limited-purpose public figure for purposes of the instant defamation claims, in which case he must also show actual malice.  A limited-purpose public figure is an individual who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." <u>Gertz</u>, 418 U.S. at 351.  There must be a nexus between "the nature and extent of an individual's participation in the particular controversy giving rise to the defamation" in order for an individual to be considered a limited-purpose public figure for the defamation.  <u>Id.</u> at 352.

In determining whether a defamation plaintiff is a limited-purpose public figure, the Court must examine: first, whether there was a particular "public controversy" that gave rise to the alleged defamation; and second, whether the nature and extent of Plaintiff's participation in that particular controversy was sufficient to justify "public figure" status in relation to that controversy.  <u>See</u> <u>Fitzgerald v. Penthouse Int'l, Ltd.</u>, 691 F.2d 666, 668 (4th Cir. 1982) <u>cert. denied</u>, 460 U.S. 1024 (1983).  Moreover, the Fourth Circuit Court of Appeals has established five factors to be considered in determining whether a person is a limited-purpose public figure:

(1) whether the plaintiff had access to channels of effective communication; (2) whether the plaintiff voluntarily assumed a role of special prominence in a public controversy; (3) whether the plaintiff sought to influence the resolution or outcome of the controversy; (4) whether the controversy existed prior to the publication of the defamatory statement; and (5) whether the plaintiff retained public figure status at the time of the alleged defamation.  Id.

After careful consideration and evaluation of the Fitzgerald factors, this Court finds that the Plaintiff in the above-captioned case is not a limited-purpose public figure for purposes of this litigation.  The Plaintiff in this matter "did not thrust himself into the vortex of [a] public issue, nor did he engage the public's attention."  Gertz, 418 U.S. at 352.

Therefore, this Court concludes that the Plaintiff is a private figure plaintiff under the Fitzgerald standard as a matter of law.  Therefore, because the Court finds Plaintiff is a private figure plaintiff for purposes of the instant defamation case, the New York Times actual malice standard is inapplicable to this case.  See id.

With regard to the second inquiry that affects the legal standard applicable to this case, namely, whether the subject matter of the alleged defamatory statement is a matter of public or private concern, the parties do not dispute that the subject matter of the disputed publications is a matter of public concern.

"Whether . . . speech addresses a matter of public concern must be determined by [the expression's] content, form, and context . . . as revealed by the whole record."  Dun & Bradstreet, 472 U.S. at 761.  Considering these factors, this Court concludes that the disputed August 6, 2010 publications do involve a matter of public concern.  The publications and broadcasts, which discuss an alleged kidnapping and alleged sexual assault of a minor, were broadcast on the August 6, 2010 5:00 p.m. and 6:00 p.m. evening television news programs, posted on Defendants' news website, and published in Defendants' daily newspaper.  The

content, form, and context of the publications demonstrate, and the parties do not dispute, that the public has an interest in and a right to know of an arrest made in the community for an alleged kidnapping and alleged sexual assault.

Therefore, because Plaintiff is a private figure plaintiff and the alleged defamatory statements were of public concern, South Carolina state law requires the Plaintiff "to plead and prove common law malice, demonstrate the falsity of the statements, and show actual injury in the form of general or special damages." Floyd, No. 4:06-cv-3120-RBH, 2007 WL 4458924, *3 (D.S.C. Dec. 17, 2007) (citing Erickson, 368 S.C. at 475–76, 629 S.E.2d at 670).[1]

## B. Falsity of the Alleged Defamatory Statements

"[A] statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least . . . where a media defendant is involved." Milkovich v. Lorain Journal Co., 497 U.S. 1, 19–20 (1990). Under South Carolina law, a private figure defamation plaintiff is "required to . . . demonstrate the falsity of the statements. [Defamation plaintiffs] bear[] the burden of proving [their] case by a preponderance of the evidence." Erickson, 368 S.C. at 475–76, 629 S.E.2d at 669–70.

The Court finds recent Fourth Circuit case law instructive with regard to conducting the proper analysis of the falsity of a publication, among other issues, for purposes of a defamation claim. In Tomblin v. WCHS-TV8, 434 F. App'x 205 (4th Cir. 2011) (unpublished), the Fourth Circuit Court of Appeals reversed a district court's grant of summary judgment in favor of the defendants in a defamation action on the basis that the plaintiff could not demonstrate the

---

[1] In Floyd, the Honorable R. Bryan Harwell provided an instructive and comprehensive outline of the state of defamation law in South Carolina. See Floyd, No. 4:06-cv-3120-RBH, 2007 WL 4458924, *3 n.3 (D.S.C. Dec. 17, 2007). The Court finds the analysis set forth in Floyd persuasive and thus concludes that, in a case involving a private figure defamation plaintiff where the alleged defamatory statements involve a matter of public concern, common law malice is the applicable standard pursuant to South Carolina law. "[D]espite this Court's disagreement with South Carolina's standard of liability for private figure plaintiffs (i.e. malice vs. negligence) and the fact that most other states use a negligence standard, as a federal court sitting in diversity, we must follow South Carolina law," which requires a private figure plaintiff to show common law malice. Id.

requisite element of falsity.  <u>Tomblin</u> involved a news story reporting that the daycare center owned by the plaintiff was alleged to have abused a child.  <u>Id.</u> at 206.  In <u>Tomblin</u>, the West Virginia state Department of Health and Human Resources ("DHHR") had recently investigated the daycare center based on a mother's allegations that her four year old son had been sexually abused at the daycare.  <u>Id.</u> at 207.  The DHHR report concluded that the "possibility that an incident [of child neglect] could occur is likely."  <u>Id.</u>

Similar to the facts presented in the instant case, the defendants in <u>Tomblin</u> relied in part on a public report of an incident of public concern (the DHHR report), and the defendants also conducted and relied on their own independent investigation and interview of the mother of the alleged child victim.  <u>See id.</u>  Unlike in the instant case, however, the defendants in <u>Tomblin</u> also contacted the daycare center plaintiff for an interview, but the plaintiff daycare center owner declined to comment despite being given the opportunity.  <u>See id.</u>

The plaintiff in <u>Tomblin</u> filed suit asserting a claim for defamation stemming from the television news broadcast about the investigation into the daycare.  <u>Id.</u> at 206.  The plaintiff in <u>Tomblin</u> argued that the broadcast at issue "was capable of multiple interpretations and could lead a reasonable viewer to believe, falsely, that an adult at the daycare sexually abused a child. [The plaintiff] also contend[ed] that she presented evidence sufficient to allow a jury to find actual malice on the part of [the defendants], pointing to the fact that . . . the reporter possessed the DHHR report which stated that the incident allegedly involved only a four year old boy improperly touching a four year old boy, as distinct from an adult abusing a child."  <u>Id.</u> at 209. The district court granted the defendants' motion for summary judgment, dismissing the case, because "all of the statements in the . . . broadcast were literally true and . . . the statements, taken together, did not evince a false implication endorsed by [defendants]."  <u>Id.</u> at 208.

The Fourth Circuit Court of Appeals reversed the grant of summary judgment, concluding that "there [were] numerous material statements that [were] capable of multiple interpretations [in the broadcast,] and that a jury could conclude that the broadcasts defamed" the plaintiff.  Id. at 209.  More specifically, the Fourth Circuit held that there was a question of fact in Tomblin as to whether the defendant published a false statement by innuendo because it knew and left out a key fact—that the alleged incident at the daycare involved two four year old boys, not an adult and a child.  Id. at 210.  The court stated, "we have reviewed the broadcast as a whole and conclude, when taken as a whole, there could be a question of fact as to whether the broadcast produced a false 'implication, innuendo, or insinuation' about the daycare."  Id. (quoting Crump v. Beckley Newspapers, Inc., 320 S.E.2d 70, 77 (W. Va. 1983)).  The court noted that the publications in Tomblin "repeatedly referred to the sexual abuse of a child in the context of a daycare, potentially creating the impression that a daycare worker abused a child. The seriousness and drama with which the broadcast was made, also indicate, something far more serious than the failure to prevent the assault of one four year old boy by another."  Id.

The Tomblin court rejected the argument that the publication at issue was true because the daycare was legally responsible for any abuse and stated that that "rationalization . . . does not . . . transform a misleading statement into a true statement."  Id. at 209.  The Court held that "[a] reasonable jury could find that [the] statement was defamatory, inasmuch as there is material difference between a daycare worker actually abusing a child in his or her care, and a daycare worker negligently supervising a child such that he or she is ultimately responsible for one child's assault of another child."  Id.

In the instant case, after careful and thorough review, this Court concludes that a reasonable jury could arguably find that the statements made by the Defendants in the August 6, 2010 disputed publications and broadcasts were defamatory.  In considering whether the

12

statements contained in the disputed August 6, 2010 publications can reasonably be interpreted as stating actual facts, this Court has considered the totality of the circumstances surrounding the publications.  This includes the Court taking into account the nature and purpose of the August 6, 2010 broadcasts and publications.

The August 6, 2010 publications at issue in this matter specifically name the Plaintiff, include his mugshot, and include excerpts of Defendants' interview of the alleged victim and his mother.  Additionally, the August 6, 2010 publications not only show what Plaintiff contends is a "one-sided interview," but, importantly, the publications also omit certain information about the reported incident that Defendants had knowledge of; the omission of which could arguably impart a defamatory meaning to the disputed broadcasts and publications.  Plaintiff attached to his response in opposition to Defendants' motion for summary judgment the Memorandum and Draft News Report prepared by Defendant Mason Snyder (hereinafter "Snyder Draft Proposal of August 6 News Report" or "Draft Script"), which Defendant Snyder submitted as his proposed news report and script for the August 6, 2010 publications and broadcasts.  (Doc. #80-8 at 2, Exhibit 7).  A statement that arguably discounts the alleged victim's credibility significantly was included in the Snyder Draft Proposal of the August 6 News Report, but was ultimately removed from the final script that was aired on the television news broadcast.

During Defendant Snyder's interview of the alleged victim and his mother on August 6, 2010, the alleged victim told Snyder that "he was held at gunpoint" in the gym locker room "by one man" and was forced by the gunman and Plaintiff "to perform sexual acts" on Plaintiff.  (Docs. #80-6; 80-7).[2]  The actual news story that was broadcast on the August 6, 2010 evening

---

[2] The Court notes that the News Release issued on June 20, 2010 by the Conway Police Department made no mention of a second gunman's involvement in the alleged incident.  (Doc. #80-3 at 2). The June 19, 2010 arrest warrants for sexual assault and kidnapping state that during the course of the alleged incident the alleged victim was warned "that if he tried to run, an accomplice, armed with a gun was waiting for him."  (Docs. #71-2 at 2; 71-3 at 2).

news included the following statements: "The teen says he was held at gunpoint in the center's locker room by one man…telling him to perform sexual acts on another man…Louis Clay Tharp.  The boy got away…and told his mother what happened that night.  They met the police the next day at the wellness center…and guess who was in the locker room…Louis Tharp." (Docs. #80-8; 80-6; 80-7).

Significantly, the Draft Proposal of the August 6, 2010 News Report prepared by Defendant Snyder originally included an additional sentence, appearing in the Draft Script immediately after the sentences listed above, about the alleged victim's account of the alleged incident: "Police said video surveillance did not indicate a gunman was involved."  (Doc. #80-2). However, that statement was ultimately removed from the final news report and therefore never broadcast.

The fact that the police stated that video surveillance of the alleged incident did not indicate a gunman was involved in the alleged incident is an arguably critical and potentially exculpatory fact.  As well, including that fact in the disputed publications would have resulted in a more balanced and accurate news report of the alleged incident.   Arguably, an individual watching the Defendants' August 6, 2010 television news broadcasts or reading the Defendants' August 6, 2010 publications about the alleged incident may have reason to doubt the veracity of the alleged victim's story had that statement regarding the absence of the alleged armed accomplice, which was originally included in the Draft Script, remained in the aired broadcast and been reported by the Defendants.  Instead, while the statement was specifically included in the Draft Proposed Script of the news report, it was subsequently removed and was not reported in the broadcasts.

Plaintiff submitted deposition testimony as exhibits attached to his response opposing the Defendants' motion for summary judgment.  (See Doc. #80).  The deposition testimony of Julie

Roy, the Executive Producer of the August 6, 2010 news broadcasts, indicates that the statement that police did not see a second gunman on the surveillance video "could have been cut [from the actual August 6, 2010 broadcasts and publications] for time reasons." (Doc. #80-8 at 9, 37, 38). Moreover, the deposition testimony of others involved in the August 6, 2010 broadcasts and publications show that the precise reason for the omission of this information from the final broadcasts and publications is unclear.

This Court concludes that here, as in <u>Tomblin</u>, by omitting certain material information about the alleged incident, the Defendants in this case arguably published a false statement about the Plaintiff by implication, innuendo, or insinuation. In leaving out certain relevant information, a reasonable jury could conclude that the Defendants created an implication of defamatory meaning, and the implication is provably false. The inclusion of certain other information, specifically that the police indicated that video surveillance did not show the accomplice, an armed gunman the alleged victim referred to, would arguably have resulted in there being no implied defamatory meaning of the disputed publications.

## IV.    ANALYSIS

Defendants further assert they are entitled to summary judgment on all claims in the above-captioned matter because the publications are substantially true, the publications are protected by the fair report privilege, the publications are not actionable under South Carolina law to the extent they contain any opinion; and that Plaintiff cannot demonstrate actual malice by clear and convincing evidence.[3] (Doc. #71-1 at 3).

_____

[3] As discussed herein, the Court concludes that Plaintiff is a private figure plaintiff for purposes of the claims for defamation in the above-captioned case. Accordingly, as a private figure defamation plaintiff, the Plaintiff must plead and prove "common law malice" rather than constitutional actual malice under South Carolina law. However, as to the issue of punitive damages, the Plaintiff must demonstrate clear and convincing evidence of actual malice to warrant such an award. <u>Hainer</u>, 328 S.C. at 135 n.8, 492 S.E.2d at 107 n.8.

A. **Fair Report Privilege**

Defendants argue they are entitled to summary judgment because the publications are protected as opinion and by the neutral reporting privilege.  (Doc. #71).  Defendants contend that the disputed publications "merely restate what was contained in the official incident report," therefore, according to Defendants, the publications "fall squarely within the privilege of fair report."  (Doc. #71-1 at 19).

Certain publications are privileged and do not constitute defamation.  If a publication constitutes a fair and true report of the public record, the publication is protected and not actionable.  Reuber v. Food Chem. News, Inc., 925 F.2d 703 (4th Cir. 1991).  The "fair report privilege shields news organizations from defamation claims when publishing information originally based upon government reports or actions."  Id. at 712.

Plaintiff contends that the Defendants should not be accorded a fair report privilege because the factual predicate for the privilege, a report based upon a government document or action, is absent in this case.  In this respect, Plaintiff argues that the independent interview conducted by Defendants of the alleged victim and his mother is what formed the basis for the information reported in the disputed publications and broadcasts, and that the interview constitutes the action of Defendants themselves, which are private entities rather than governmental entities. (Doc. #80).

This Court agrees with Plaintiff and finds that the fair report privilege is inapplicable to the instant case in which the disputed publications publish information originally based upon their own investigation and interviews, rather than a government report or action.  The Court notes that the original publication made by the Defendants on June 20, 2010, which is not at issue in this case, was indeed originally based upon a government report, namely, the Conway Police Department's press release.  However, the disputed August 6, 2010 publications at issue

in this case are those predicated upon the Defendants' interview and investigation, and the fair report privilege is therefore inapplicable to shield Defendants from defamation claims arising from those publications.

## B.  <u>Statements of Opinion</u>

Defendants further assert, to the extent that Defendants' publications contained opinions, the publication of those opinions is immune from liability under <u>Gertz v. Welch, Inc.</u>, 418 U.S. 323, 339–40 (1974).  Defendants argue that a statement cannot be defamatory if the statement is opinion which is incapable of being proven true or false.  Relying on <u>Bidzirk, LLC v. Smith</u>, No. 6:06-109-HMH, 2007 WL 3119445 (D.S.C. Oct. 22, 2007), Defendants argue that the following two published statements are opinion statements made by the "alleged victim's mother . . . that cannot be objectively proven true or false and thus are constitutionally immune from liability" (Doc. #71-1 at 24–25):

A.  Time and therapy seem to be the two things helping the teen cope with the agony of what happened.
B.  The boy's mother wonders if her son will ever be the same again.

In response, Plaintiff asserts that the two statements were not comments made by the alleged victim's mother, but rather were "the Defendants' own editorial additions to the interview of the alleged victim and his mother."  (Doc. #80 at 15).  Moreover, Plaintiff argues, relying on <u>Milkovich v. Lorain Journal Co.</u>, 497 U.S. 1 (1990), that the key inquiry to be made by the court with regard to opinion is "whether a reasonable factfinder could conclude that the statements . . . imply an assertion" that is "sufficiently factual to be susceptible of being proved true or false."  <u>Id.</u> at 18, 21.

In <u>Milkovich</u>, the United States Supreme Court clarified that its holding in <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323 (1974), was not "intended to create a wholesale defamation exemption for anything that might be labeled opinion."  <u>Id.</u> at 18 (internal quotations omitted).

The Court went on to explain that such an interpretation would "ignore the fact that expressions of 'opinion' may often imply an assertion of objective fact." Id. In Milkovich, the Supreme Court rejected "any artificial dichotomy between 'opinion' and fact," which various courts had used based on *dicta* in Gertz, and it further found that several existing doctrines adequately protected the expression of ideas. Id.

After careful consideration and in light of the case law, this Court finds that the two statements noted above are not statements of protected opinion made by the alleged victim's mother, but rather are statements made by the Defendants which contain assertions that a reasonable factfinder could arguably conclude are sufficiently factual to be susceptible of being proved true or false.

The Supreme Court noted in Milkovich that the culpability requirements as expressed in defamation case law "ensure that debate on public issues remains 'uninhibited, robust, and wide-open.'" Id. at 20 (quoting New York Times, 376 U.S. at 270). More specifically, "where a statement of 'opinion' on a matter of public concern reasonably implies false and defamatory facts regarding a . . . . private figure plaintiff, a plaintiff must show that the false connotations were made with some level of fault as required by Gertz." Id. at 20–21.

## C. **Substantial Truth**

Finally, the Defendants argue, regardless of whether Plaintiff is a public figure required to prove actual malice, they are still entitled to summary judgment because the publications were substantially true. (Doc. #71-1 at 36). Defendants argue the publications are substantially true because they do not differ significantly from the press release issued by the Conway Police Department on June 20, 2010.[4] (Doc. #71). The Defendants contend that they "did not

---

[4] Defendants also attempt to rely upon a Complaint filed in a civil case. (See Doc. #71). The Court notes that the civil case was filed after the alleged defamatory broadcast and publications; therefore, it is not possible that Defendants relied on any public record relating to the civil complaint.

misrepresent" the information contained and published in the disputed broadcasts and publications and that Defendants "had no reason to doubt the news [they] reported." (Doc. #71-1 at 38).

In response, Plaintiff contends that the Defendants' argument "ignore[s] the central feature of the August 6, 2010 Broadcasts and Publications: Defendants were not reporting on the public record of Plaintiff's arrest, as they had [already] done in their June 20, 2010 story based on the Conway Police Department News Release. [Instead, Defendants] were broadcasting and publishing a biased and one-sided interview of the alleged victim and his mother in which the Defendants took sides in the matter and declared Plaintiff guilty." (Doc. #80 at 27).

The Court finds Plaintiff's argument persuasive. The August 6, 2010 Broadcasts and Publications were based not on the public record of Plaintiff's arrest, but instead were arguably reports based upon the Defendants' independent investigation and interview. Statements contained in the August 6, 2010 broadcasts and publications arguably go beyond what specifically could have been gleaned from the press release or other public records concerning the alleged incident. Instead, the August 6, 2010 disputed publications contained an interview of the alleged victim and his mother and, importantly, omitted information that had originally appeared in the draft script publications regarding the police indicating the absence of an alleged accomplice armed with a gun on the video footage. A reasonable jury could determine that the August 6, 2010 broadcasts and publications included statements made by the Defendants which conveyed a false and defamatory impression about the Plaintiff.

Even if, as a whole, the publications in this case were substantially true, a reasonable jury could arguably find that the omission of other material, and perhaps exculpatory, facts distorted the truth of the published statements as to make the entire publication false and defamatory.

### D. **Fault on Behalf of Defendants' – Malice Requirement**

This Court concludes there are disputed material facts in this case with regard to the question of whether the Defendants "deliberately or recklessly conveyed a false message to sensationalize the news," thus providing factual support for a finding of malice.  See Tomblin, 434 F. App'x at 210.

As discussed above, this Court has determined that the Plaintiff in the above-captioned matter is a "private figure" plaintiff for purposes of the defamation claims asserted in this case. Additionally, the speech involved in this action is a matter of public concern.  Thus, the Plaintiff is required to prove falsity of the statements as well as common law malice on the part of the Defendant.  See Erickson v. Jones St. Publishers, L.L.C., 368 S.C. 444, 466, 629 S.E.2d 653, 665 (2006) ("Common law malice means the defendant acted with ill will toward the plaintiff, or acted recklessly or wantonly, i.e., with conscious indifference of the plaintiff's rights."); see also Floyd v. WBTW, No. 4:06-cv-3120-RBH, 2007 WL 4458924, at *3 n.3 (D.S.C. Dec. 17, 2007) (discussing the current state of South Carolina defamation law and stating that the South Carolina Supreme Court in Erickson concluded that "South Carolina precedent required a common law malice standard of liability for private individuals to recover against media defendants.").

There is a distinction between the legal standards of constitutional actual malice and South Carolina common law malice.  Hainer v. Am. Med. Int'l, Inc., 328 S.C. 128, 135 n.7, 492 S.E.2d 103, 107 n.7 (1997).  Pursuant to South Carolina defamation law, common law malice "means that the defendant was actuated by ill will in what he did, with the design to causelessly and wantonly injure the plaintiff; or that the statements were published with such recklessness as to show a conscious indifference toward plaintiff's rights."  Jones v. Garner, 250 S.C. 479, 488, 158 S.E. 2d 909, 914 (1968); see also Erickson v. Jones St. Publishers, L.L.C., 368 S.C. 444,

466, 629 S.E.2d 653, 665 (2006) ("Common law malice means the defendant acted with ill will toward the plaintiff, or acted recklessly or wantonly, i.e., with conscious indifference of the plaintiff's rights." (citing Padgett v. Sun News, 278 S.C. 26, 32, 292 S.E.2d 30, 34 (1982))). Malice may be proved by direct or circumstantial evidence.  Hainer v. Am. Med. Int'l, Inc., 328 S.C. 128, 136, 492 S.E.2d 103, 107 (1997).  "Whether actual malice is the incentive for a publication is ordinarily for the jury to decide." Murray v. Holnam, Inc., 344 S.C. 129, 144, 542 S.E.2d 743, 751 (Ct. App. 2001).  "Proof that statements were published in an improper and unjustified manner is sufficient to submit the issue [] to a jury."  Hainer, 328 S.C. at 136, 492 S.E.2d at 107; see also Murray, 344 S.C. at 144, 542 S.E.2d at 751.

In the August 6, 2010 disputed publications, the Defendants had knowledge of, yet omitted, an arguably important, exculpatory fact regarding the reported incident; namely, that the police stated there was no accomplice armed with a gun present as alleged by alleged victim based on the video surveillance footage.  The Court further notes that, arguably, notable inconsistencies exist between the alleged victim's story as told to defendants during their interview of him and his mother and the Conway Police Department's Press Release and arrest warrants.  (See Docs. #71-2; 71-3; 71-14; 80-3).  For example, the News Release issued on June 20, 2010 by the Conway Police Department made no mention of an armed accomplice's involvement in the alleged incident.  (Doc. #80-3 at 2).  The June 19, 2010 arrest warrants for sexual assault and kidnapping state that during the course of the alleged incident the alleged victim was warned "that if he tried to run, an accomplice, armed with a gun was waiting for him." (Docs. #71-2 at 2; 71-3 at 2).  However, the alleged victim specifically stated that "he was held at gunpoint" by one man and was then forced "to perform sexual acts" on the Plaintiff during Defendants' August 6, 2010 interview of him.  (Doc. #71-14 at 3).

21

Arguably, when taken as a whole, considering the inconsistencies presented between the alleged victim's statements about the incident in his August 6 interview and what was reported in the Police News Release, as well as the alleged victim's report of the alleged incident as stated in the arrest warrants, combined with the additional information provided by the police regarding the absence of a second gunman on the video surveillance footage of the alleged incident, the Defendants in this case had sufficient "reasons to doubt the veracity of the [alleged victim] informant or the accuracy of his reports." Fitzgerald v. Penthouse Intern., Ltd., 691 F.2d 666, 670 (4th Cir. 1982). Additionally, the Court notes that the Defendants in this matter made no attempt to contact the Plaintiff at any time prior to publishing the disputed broadcasts and publications, but instead appear to have relied solely upon their interview of the alleged victim and the alleged victim's mother conducted at their private home for the information that was ultimately reported in the publications at issue in this case.

Moreover, the Defendants submitted deposition testimony in support of their motion for summary judgment. (See Doc. #88 and attached exhibits #88-2; 88-3; 88-4; 88-5). The Plaintiff argues, and the record suggests, that no protective or precautionary measures, such as vetting, nor any training of the investigative reporters, were in place or utilized to protect against this type of reporting error.[5] (See Doc. #80 and attached exhibits #80-5; 80-9; 80-10; 80-11; 80-12; 80-13 and Doc. #88 and attached exhibits #88-2; 88-3; 88-4; 88-5). Thus, drawing all reasonable inferences in favor of the Plaintiff as the nonmoving party, evidence of common law malice on the part of Defendants could exist based upon the record presented to this Court. Arguably, a reasonable jury could conclude that the Defendants' alleged failure to utilize some protective measures before publishing such a story was such a deviation from reporting practices that it

---

[5] The Court notes that additional deposition testimony, such as that of Mr. Dan Bradley (Doc. #80-13), who is presently employed by Media General as the President and General Manager of an Ohio station, arguably suggests that standard reporting industry practice should have in place a process for a producer's vetting and approving a news story prior to its broadcast. (See e.g., Doc. #18-13 at 6).

amounted to a reckless or conscious disregard of the rights of the Plaintiff. It is for a jury to determine whether the Defendants' acted with common law malice, as discussed above.

Accordingly, this Court concludes that evidence has been submitted from which a reasonable jury could arguably conclude that the Defendants' conduct amounted to common law malice, thereby precluding summary judgment in the above-captioned case.

## V.    CONCLUSION

For the reasons outlined herein, this Court concludes that factual questions exist in this case, precluding the entry of summary judgment on Plaintiff's defamation claims. This Court finds that there are material questions of fact as to whether the publications created a false defamatory implication in this matter, whether Defendants had reason to doubt the news reported or the veracity of their sources, and whether Defendants acted with the requisite malice, all precluding the entry of summary judgment on Plaintiff's defamation claims. See Murray v. Holnam, Inc., 344 S.C. 129, 144, 542 S.E.2d 743, 751 (Ct. App. 2001) ("We find genuine issues of fact exist regarding whether the statement was made with actual malice. The issue of actual malice is properly a question for the jury."); see also Swinton Creek Nursery v. Edisto Farm Credit, 334 S.C. 469, 514 S.E.2d 126 (1999) (finding factual inquiries, such as whether the defendants acted in good faith in making a statement, are questions for the jury).

Accordingly, after careful consideration and review, **IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. #71) be, and hereby is, **DENIED.**

**IT IS SO ORDERED.**

s/ Terry L. Wooten
TERRY L. WOOTEN
Chief United States District Judge

December 16, 2013
Columbia, South Carolina

23